And we turn now to the next case to be heard, which is 20-2548-AG, Alix v. McKinsey & Co., et al. Mr. O'Shea? Thank you, Your Honor. May it please the Court? Your Honor, Your Honors, this appeal centers on one primary issue, and that is proximate cause. Whether the plaintiff's injury is direct under the RICO proximate cause test. The District Court erred by conflating, in this case, the concept of RICO proximate cause with the concept of proof of damages. Once you clear away the confusion caused by what the District Court termed counterfactual causal chain, the proximate cause inquiry here is actually pretty straightforward. Plaintiff has pre-pleaded proximate cause because it is a member of a class, and the only class, of direct victims of McKinsey's fraud. It was a competitor for the bankruptcy advisory position along with McKinsey. Or, more to the point, there is no other victim more directly injured than the plaintiff. This case, Your Honors, is just like the Supreme Court's opinion in Bridge. In fact, if Bridge doesn't control here, I think it's fair to say it has no precedential value at all. Both here and in Bridge, the competitors vied on a zero-sum basis for a finite number of business opportunities. Alex Partners is just like the bidders in Bridge who played by the rules, who only had one bidder in the room. McKinsey is like the bidders that cheated in Bridge, that flooded the room with multiple bidders contrary to the rules. The debtor estate is just like the auctioneer in Bridge who can only choose an applicant who follows the rules and is qualified. And the bankruptcy court is- But the difference is in Bridge, there's a high degree of certainty that the universe of winners was in the room. Here, we don't know whether, absent McKinsey's put-aside, you don't have to talk about gin on, but put-aside gin on. It seems to me that in the vast majority of these cases, you still have to convince us that you've adequately alleged that your client would get this business had McKinsey not falsified its applications to the bankruptcy court. Well, your honor, there are four players in this very limited market for high-end bankruptcy assignments, over a billion dollars. And if what we know is that McKinsey is disqualified because, for example, I'll put aside gin on. I'll use SunEdison as an example. In SunEdison, they had an undisclosed $6 million preference payment, which was hidden, not disclosed. What we know is if they had disclosed that, they would have been disqualified. How do we know that? Your opponents say, well, the bankruptcy court could have waived the conflicts had they been disclosed and become an issue. McKinsey could have somehow finessed the conflicts and so forth and so on. So their position is that even if they had filed applications that had not been perjured, your client may not get the business. Well, two answers to that, your honor. One is these are fact issues that we haven't had an opportunity for discovery. The other answer to that. But once they discover, how do you plausibly allege in these cases that there were other bidders that you would have gotten the business? Because we know that McKinsey would not, and we would be among the only of the group of three that would be qualified to Is that enough? Is that enough for proximate cause that you're one of three? Well, it is enough to show your honor that we were in the running and McKinsey got the assignment by fraud and that some of the fraud is automatically disqualifying the district court or excuse me. We're not we're not arguing with you about whether McKinsey is out. The only one who's in? Well, no, your honor. We would be among. We would be two other competitors. We would have to show. And when you're talking about fraud, you necessarily are backing up the calendar and you have to show that through discovery. And like the disappointed bidders in Bridge, your honor, they would have to show through either in the law. The law allows for some degree of uncertainty in damages where fraud has occurred. And we would have to show by probabilistic means that we would get those assignments. That would be for discovery. When I say, well, that's interesting phrase. Probabilistic means if this went to trial, do you show win on probable on approximate cause simply by showing you would have been one of three winners with odds of you were one out of three possibility or do you have to show you would have gotten the contract? We would have shown we would have to have shown that, for example, here's a good example to answer your question. Now, just a minute before you get your example. Just tell me at trial, would you have to show merely that you were one of three or that you would have gotten the contract? We would have. I think we could do it both ways, frankly, your honor. And there are some examples that we plead in our. No, I'm giving you a choice. I mean, I guess you can say you would have done both, but I'm trying to understand, is your burden of trial discharged by showing you were what would have been one of three winners or did you need to show you would have been a winner? As I said, your honor, and here's why I'm answering the question the way I am. I'm not avoiding your honor's question. There are in our complaint, we plead three instances where we did not get. There's usually a beauty contest in these bankruptcy assignments. We did not get in the room. It was done in some sort of private way. Yeah, I get all that. I'm just trying to ask you what you think you need to prove at trial. Either only that you were one of three or that you would have gotten a contract. I think we have to show that we would have gotten a contract. All right. If that's what you have to show, did you plead that in your complaint that you would have gotten a contract? And we can show that. And I would direct your honor to BCS, the case on remand. No, no, no, no. Just you're dealing with the complaint. Can you tell us which paragraph of the complaint? I don't have the complaint just in front of me just this moment, but yes, I can provide that information to the court. Well, you'll have on your bottle. Can you get us? I can try. I can try. Judge Parker. Thank you. Let me ask you this. Am I correct that in gin on your client and McKinsey were the last two standing? Current version. You know, your honor, I would be guessing on that question as I sit here, so I don't want to do that, but I can find that answer for you. All right. I have a couple of housekeeping questions. If I may associate on that jurisdictional question first. In your opening brief, you incorporated your form C file to this court stating that you quote hereby discontinue with prejudice your state law claims. I want to be sure that I understand this situation. I take it you will confirm now that you agree to the dismissal of your state law claims with prejudice. Yes. Yes, your honor. Okay, fine. Now, at a very mechanical level, I suppose, as opposed to the high theory with which we sometimes deal with these matters. What discovery exactly would you be seeking from McKinsey regarding the pay to play scheme if we indeed vacated and remanded to the district court? Just briefly outline what you think you Well, among other things, your honor, we understand that McKinsey personnel went to various other providers of bankruptcy services. And in doing that, they through PowerPoints and through oral presentations made these offers and that there are witnesses out there. So we would seek to find out that marketing effort and oppose those witnesses, among others. Hold on one second. Hold on a second. Hold on. Sure. Parker could mute his. Could you mute your microphone? I'm sorry? I think you should mute your microphone. Oh, I'm sorry. I beg your pardon. No, it's okay. It's fine. We just want to make sure that Mr. O'Shea can be understood. So go ahead, Mr. O'Shea. Sorry. Thank you, Justice Reynolds. So we would ask for, you know, these are the obvious things that occurred to me. We would ask for discovery as to those PowerPoints, those presentations that we understand from witness interviews that McKinsey was going around in its marketing to other players in the industry saying, if you choose us, we will introduce you to certain of our favorable clients, which under the bankruptcy laws is not allowed. It's not legal. So that's those are the ways, some of the ways off the top of my head that I would pursue that in discovery. Let me ask you this. In order to prove your case that you would have, in order to litigate, let me put it this way, the issue of whether you would have gotten these assignments, notwithstanding McKinsey's fraud, would you have, for example, to take discovery from bankruptcy judges, U.S. trustees? Well, I don't think we would have to take discovery, nor I think would we be permitted, Your Honor, frankly, to take discovery from... How else would you prove your case? Well, Your Honor, I think some of these bank... Well, look, Judge Jones, for example, who we tried the Westmoreland case in front of, has been very straightforward on his belief that McKinsey, quote unquote, just didn't get it in their violation of the law. But Your Honor, what we would do is through, and we did this in our complaint, is offer expert testimony through retired bankruptcy judges that what is and is not a violative of the bankruptcy laws and certain bankruptcy scholars at prominent law schools, two of whom we attached expert affidavits to our complaint. I'm sorry, one other question I have you. Let's just see. With respect to all the beauty contests, if you will, that are at issue in this court, we found you to adequately plead proximate cause with respect to two of them. What would then happen to... Do you think to consider if you're allowing two, why are we not... This is just hypothetical. We've not made up our minds on any of this, but what would this case at that point look like? Well, Your Honor, we have to prove one. We would want discovery to go forward as to all 13. The problem we have here, Your Honor, is that the proximate cause inquiry has to be answered in the affirmative that we have direct injury. Our problem is not that the resolution, it's the resolution on the pleading, Your Honor, that we have not had the opportunity and the counterfactual analysis that was offered by the district court that is contrary and, frankly, made up. For example, one of the concerns was, well, how do you know that McKinsey, that the people in the bankruptcy withstanding would have complained? Well, for example, you've got a $6 million undisclosed preference payment. We think it's pretty obvious people would complain if they knew that the bankruptcy advisor with the fiduciary duty is stealing from the estate, they would have a problem with it. We would want to pursue in a real fashion like we did in Westmoreland Cole, real evidence to get in front of the court and perhaps these issues, maybe there's a problem with them, Judge, but not at the pleading stage. Really what we should be doing is building out the record and then hearing and seeing where we're at at summary judgment, for example.  May I begin, Judge Koubranos? You're muted. Thanks. That's very helpful. So let me repeat myself, since only I heard my question. I'm going back to Judge Newman's line of questioning and Judge Parker's on the question of how you would prove that Alex Partners would have gotten some of that business, even if McKinsey was out of the picture. Now, I think at some point, Mr. O'Shea, this is for Mr. O'Shea, wherever he may be in the Zoom world, where is he? Do we have him? Hold on a second. We're having some issues. He's here, Judge. Mr. O'Shea? Yeah, I want to see Mr. O'Shea. He's not on our screen. Pardon me, Your Honor. I thought I had to... I'm sorry. Yeah, go ahead. So I don't want to have to repeat again, but I will. I'm sorry, Mr. Englert is not on my screen. That's okay for the moment. Here he is. Welcome back. This is for Mr. O'Shea. On the question of proving that Alex Partners would have gotten some of what that business, even if McKinsey was out of the picture, you deployed that fancy term probabilistic, which I suppose is a tribute to Judge Richard Posner. But what exactly do you mean by the deployment of probabilistic? Well, Your Honor, we would have to show that... Look, historically, we've gotten roughly 25% of the market, and that there are certain bankruptcies as to which we had unique skills for the bankruptcy. And because of the pay-to-play allegations, there was no beauty contest, and we were excluded. So we would want, through expert testimony and testimony of people in the have gotten a certain percentage of the business. Just before I leave you, I hope that answered Your Honor's question. Well, not quite. I mean, you're not suggesting we need to have a fancy form of theoretical analysis. By probabilistic, you were not invoking some form of statistical analysis, necessarily, right? Well, I don't know what Your Honor means by statistical analysis, but I think what we would is... Well, the probabilistic estimation to which I think Judge Furman may have referred, perhaps in turn relying on Judge Posner. I have no doubt that Judge Posner would be able to handle probabilistic analysis. But what is it that you would want mere mortals to do? Well, Your Honor, I think what we would have to do is what I suggested, and that is there are three players once we remove McKinsey from the marketplace. In some of these, Alec Partners has unique skills for that particular bankruptcy. And historically, in the last how many years... And again, I'm not an expert, Your Honor. I would want to talk to experts, but we have, and they would say that you have a statistical probability given all the facts, like any trial where we put on expert testimony. So, Your Honor, it has caught me, obviously, cold on this, and we'd want to give this issue more thought. But the question is, what comes out of discovery? Because we know that this case has been dismissed on the pleadings. This is an important case. This is a case that really turned Judge Jones's head when he heard some of the evidence we had. Let me try to put that same thought slightly... Well, in the terms you use, when you use probabilistic, do you think at trial you would have to show that it is more likely than not that you would have gotten a contract? Yes. Or do you simply have to prove that there is some probability that you would have gotten it? Which is it? That you would have gotten it, or just a more than de minimis probability that you would have gotten it? It's the former, Your Honor. That you would have gotten it? That there is a more likely than not that we would have gotten at least one of those. All right. So, when you refer to probabilistic, which invites us to consider the probabilities that you would have gotten it, that is really not your argument, is it? It was a shorthand, Your Honor. And if it was confusing, I apologize for that. It is the former of the two examples that you posited is what I think we have to show. Okay. So, the district court was entitled to look at your complaint to see if there was a plausible allegation that you would have gotten a contract. Isn't that the test? Well, I don't think that this is an Iqbal analysis, if that's where Your Honor is going. I think this is really a bridge analysis in the first instance. This is in no way the kind of problem that the Iqbal Twombly type issue. This is really, because this complaint is very detailed, and it's not just conclusory and labelistic and the kinds of problems that the courts found in Iqbal, for example. Well, I'm not suggesting it fails Iqbal. I'm just confronting you with the threshold requirement in order to meet Iqbal. And I take it you agree. If we look at your complaint again, we need to find in it a plausible allegation that you would have gotten a contract. Is that right? I think that's a fair statement of the standard, Your Honor. I think it is. And the district court found you had not done that. Is that right? Well, the district court found that we misapplied bridge, for example. I don't think the district court applied Iqbal explicitly and found that we had failed that standard. Did the district court dismiss your complaint? Well, yes, but not on Iqbal, Your Honor. Well, then the district court dismissed your complaint, the district court must have found your pleading was insufficient. Isn't that so? Well, there are other ways other than Iqbal, Your Honor, respectfully. At this point, I don't care what the district court cites. If it found your pleading deficient, so deficient as to dismiss, it found it didn't satisfy the modern requisites for adequate pleading. Isn't that right? No, unfortunately, it's not right, Your Honor. Did the district court dismiss this on some ground other than an inadequate pleading? Well, Your Honor, if what Your Honor said were so, then every case that gets dismissed was found to be implausible under Iqbal, and that's not... Look, whether it's implausible, I thought was the issue on appeal, but the district judge seemed to think it was an implausible conclusion that you would have gotten it, and so the court dismissed it. I don't know why you're resisting that, and you want to say it is inadequate pleading, right? Yes, Your Honor, of course. It is under a bridge, which is what... The court dismissed this really by driving the two concepts of damages. The court said this would be too hard to prove, not that it was implausible, but it would be that he ran, and I say this respectfully, ran the damage analysis together with the RICO directness analysis, and that's why I know some fun's been had here with Judge Posner, his reputation, but BCS, the remand on bridge, really separates out the analysis and happens to be the correct analysis. Okay. All right. Thank you. I just wanted to get back to you. I think it was 536 and 534. Hold on a second. You're going to have the treat of some time on rebuttals, but your first time around is over. Okay. All right, and by the way, just so the record is straight, I certainly wasn't poking fun at Judge Posner. I was expressing deference to Judge Posner. Okay, Mr. Engler, you're up. May it please the court. Two of the factors that the Supreme Court and this court have set out in assessing RICO approximate cause are whether there's a better situated plaintiff and whether there would be complexity of proof and apportionment of damages. Let's apply those standards to what you heard from Mr. O'Shea just a few minutes ago. Mr. O'Shea said that McKenzie was stealing from the estate in one of these cases. If that's true, the most directly injured plaintiff is, of course, the estate, not Alix Partners, which merely would have competed for business. As to complexity of proof and apportionment of damages, you heard from Mr. O'Shea about expert testimony. You heard from Mr. O'Shea about probabilistic proof. What could better demonstrate that the proof of injury and apportionment of damages would be complex in this case than hearing that you would have to hear expert testimony and use probabilistic analysis? Well, don't don't don't don't. I I acknowledge that this is a case that has potential complexities, the likes of which we very rarely see. But you're asking us to walk away from a situation where your clients systematically day in and day out defrauded the bankruptcy court by filing false disclosure records. That's what's out. That's what's rationally pled. So what are we to do? No harm, no foul. We don't care about the reputation of the courts. How are we to confront that reality, which is sketched out, which is laid out in exhaustive detail in this complaint? Judge Parker, if I may answer that question with a preliminary observation and then the real answer, we do dispute everything in the complaint. This is what we say. So, of course, it doesn't matter. I understand that. But I just wanted the record to show we dispute those allegations. Now, the reason that this case was properly dismissed and was properly dismissed for the correct reasons by Judge Furman is because RICO proximate clause is an incredibly demanding standard laid out in Empire Merchants and in the Supreme Court cases that this court synthesized in Empire Merchants. And only the direct victim gets to bring a RICO suit. The general tendency is not to go beyond the first step. And in fact, the last question in a RICO approximate cause inquiry is the first step. The first step here is allegedly defrauding the bankruptcy courts. The second step is allegedly disqualifying McKinsey. The third step is the debtor choosing Alix Partners. The fourth step is the bankruptcy court in its discretion approving Alix Partners. That is not the stuff of which RICO approximate cause and direct injury is made. Well, let me ask you to focus on Gen On. In Gen On, there were but two bidders left standing, McKinsey and Alix. And the complaint alleges that McKinsey's disclosure statements under penalties of perjury were false and they still got the business. I mean, why isn't that approximate cause? For lots of reasons, Your Honor. First of all, if the information that allegedly should have been disclosed had been disclosed, the first thing that would have happened is the bankruptcy judge would have made a discretionary decision whether to disqualify McKinsey. The second thing is McKinsey would have said, can we cure this alleged violation with a divestiture, with foregoing fees, with a Chinese wall? There are all sorts of things that could have been done. Now, that is something that strikes me as highly speculative. If I'd been a bankruptcy court and I'd gotten a falsified disclosure statement, I would have said goodbye, McKinsey. I wouldn't have danced around. Well, Your Honor, the tie goes to the defendant who was speculating in these cases. If you look at Empire Merchant, the court says in many places what could have happened and what might have happened. To indulge in a presumption that gives me some pause and maybe you can help me, that is, if you put in a falsified disclosure statement, the court might bless it, might finesse it. But that's only the first of several steps, if I may, Judge Parker. I didn't mean to interrupt. I'm sorry. Yeah. But that's only the first of several steps. So McKinsey is out, which we know. The only one that's left is Alex. Why isn't there a strong probability that Alex would have gotten the business if there was nobody else? One, strong probability isn't enough. But two, more important, this is not a zero-sum game. Debtors don't have to hire an advisor like this. Debtors do sometimes go without an advisor like this. Sometimes, as in the Harry and David case identified in the complaint, debtors hire two advisors. Both McKinsey and Alvarez were hired in that case. So this is the polar opposite of a zero-sum game. The debtors make their own business decision whether to hire an advisor at all, if so, which advisor to hire, and if so, whether to hire more than one. It is not at all like Bridge and BCS. Well, Mr. Engler, you outlined the four steps that stand between your adversary and a remand. And I accept for the moment there are four steps. But leaving aside the label probabilistic, which he clearly indicates to us is really not the theory of his case. He's not inviting us to come up with a probability that he would have gotten it. He says he has to prove that it is more likely than not that he would have gotten it. He says, yes, that's his burden. So to me, the only question is at the dismissal stage, did his complaint plausibly plead that he would have gotten it? Now, you can tell us, well, there are four bases he's got to touch before he scores a home run or crosses the plate. That may be, but the question remains, did he plausibly plead that he would have gotten it? If he did, he gets a remand, does he not? No, Your Honor, for lots of reasons. First of all, let me just refer to the complaint itself. In this case, the complaint does not say he would have gotten any particular assignment. The complaint says Alix Partners would have gotten at least some assignments. Well, isn't that enough? He doesn't have to identify the contract, does he? Isn't it enough to plead he would have gotten at least one? No. In Empire Merchants, there was only one liquor product in New York State. And yet, even though the complaint alleged that liquor was smuggled into the state illicitly in violation of that competitor's franchise, the competitor still was dismissed for lack of RICO proximate cause. Why? Because it wasn't necessarily the case that customers would choose to buy from that seller. That's a much, much, much stronger RICO proximate cause case than this case. And yet, Judge Livingston, depending on this court, ordered dismissal because the conclusion didn't necessarily follow from the premise. It's not a more likely than not standard in this area of law, Judge Newman. It's a what necessarily follows. And this is all part of an inquiry into directness. Once we identify what the issue is, the burden of proof is more likely than not. It is a civil case. We're not convicting anybody. It's a civil case. The substance of RICO proximate cause, not the burden of proof, but the substance of RICO proximate cause, is that only direct victims get to sue. That may be. But if that's the standard, the burden of proof is you merely have to prove more likely than not that the standard would have been met. Isn't that so? Of course. Okay. All right. Well, I understood you to say it's not a matter of more likely than not. It is a matter of more likely than not. With respect, Your Honor, we're talking past each other a little bit, and may I try to clarify? Sure. The procedural burden of proof at a trial in these cases is more likely than not. But what is it that has to be more likely than not? It has to be more likely than not that the plaintiff was the direct victim, not that it was injured. That's but forecausation. But it was the direct victim of the fraud. That's proximate causation. Exactly. I only interjected when you said it's a matter of more likely than not. As you just said, it is a matter of more likely than not. But there's a disagreement of what has to be proven to be more likely than not. And he says he's prepared to prove at trial that it is more likely than not he would have been proven. And I take it your point is he doesn't plausibly plead which contract he would have gotten. My major point, Judge Newman, is not the which contract point. It's that he doesn't plausibly plead that his client was the direct victim, which is what reproximate causation requires. Well, when you say the direct victim, if he can persuade a jury that he would have gotten at least one contract without specifying which one, does he win? No, absolutely not. Well, then you're saying then he must do then. Then you're saying he at trial, he must do more than prove that he would have gotten at least one. And your view, I take it he must specify which one he would have got. Is that right? That's one of the pleading defects. But that's not the major pleading defect. The major the most important pleading defect is that he doesn't plead that he was the and I do use the definite article, the direct victim rather than and. Well, with all respect, counsel, I really think that's playing with words, because if he can prove he would have gotten a contract, then he is a victim. Isn't he? In a for causation sense, yes. Well, you just been telling me, well, that's not the big defect. The big defect is is I forget your exact words, but something like he didn't prove he's a victim. No, that's your point. The definite article directed. That's my point. You're not saying he must prove he's the only victim, are you? Yes. That's the language that is used in empire merchants. The direct meeting Rico plaintiff. Confronting a defendant who has defrauded three people always loses because he's not the only fraud victim. Is that not if they're all on the same on the same line, they're all three direct victims. That's fine. You can have more than one direct victim. Well, here you have a couple of people applying for a contract and he says he can prove he would have gotten one of them. And you're saying that's not good enough. Is that right? I am saying that's not good enough, but this isn't applying for a contract. This is negotiating with a debtor to provide services to the debtor and then submitting an application. This is not like this is not at all like bridge and BCS. And this is certainly not like a government contracting situation. Don't call it a contract. Call it an award. Is that fair? It's a hiring decision. And as this court and Supreme Court have observed, businesses lose and gain customers for many reasons. That's a direct quotation from both empire merchants and onza. And that by itself is enough to break the chain of causation, according to this court in the Supreme Court. If a requirement for getting any of these contracts is bankruptcy court approval and the bankruptcy court was given a false application, which it approved, is the bankruptcy judge, the bankruptcy court, a direct victim? The bankruptcy system is the direct victim and the U.S. trustee. I don't know what that means. What's the system? The judge sought. What about this? Let's start off with the judge who signed the order of approval. If he's been defrauded, then, of course, yes, he is a direct victim. So. But he's not going to bring a suit. Under your theory, since all of these contracts required bankruptcy court approval, the judge, you said, is the direct victim. So no one else can recover. Well, the U.S. trustee is charged by law with monitoring these applications and with commenting on these applications. And if a false application is submitted to the bankruptcy court, the U.S. trustee and the bankruptcy court are defrauded simultaneously. And in fact, in some of these matters, the U.S. trustee has spoken up and said, we want a full we want a fuller declaration from our. Engagements in this case, yes, the Alfa Natural Resources case and the Westmoreland case, which Mr. O'Shea has talked about several times, Judge Jones's case, in which incidentally, Mr. O'Shea is quoting remarks from the bench and not judicial actions. But those are two of the cases in which the U.S. trustee got very involved and said, we want more disclosures. So the U.S. trustee is better situated than ALEC's partners to pursue this. If there really were theft from debtors, as Mr. O'Shea suggests, the debtors would be better situated to pursue this. There's no reason to grant competitor standing with regard to which the Supreme Court and this court have said should be skeptical in a repo case because of the absence of better situated plaintiffs. There are better situated plaintiffs, which is just one of the factors, but it's sufficient by itself to require dismissal. Is your point that even if he has plausibly pled that he would in fact have gotten selected? He loses because he's not the only one who would have been selected. Is that your point? No, my point is he's an indirect victim. No matter how positively he pleads, he would have gotten the contract. He's still an indirect victim. That's my point. How is he indirect if he doesn't get a contract that would have put a lot of money in his pocket? Well, let me quote Anza, also quoted in Empire Merchants. A repo plaintiff cannot circumvent the proximate cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense. That's what ALEC is saying is sufficient in this case, that he can plead that his market share was less than it would be because of McKinsey's actions. Those are the exact words the Supreme Court and this court have used to say what's not sufficient in a repo case. It's because the competitor is always, well, I don't want to speak too broadly. It's because the competitor in this case and in many such cases is an indirect victim. There were no fraudulent statements to ALEC. There were fraudulent statements to courts and to the US trustee according to the complaint. Courts had to do something. Debtors had to do something. Those are the actions, separate actions by separate actors to break the chain of causation in this case. So that's what you mean by indirect, that there are steps in the chain of approximate causation. Yes. It's not one step. It's perhaps three, maybe even four. Yes. As Judge Furman held, there are at least three steps that separate ALEC from the alleged fraud. And that's what you mean by an indirect victim? Yes. And on page 23 of our Yes. But it's not that he can at trial succeed in proving those. It's not that you should remand for the trial court to consider those. The existence of those steps is what renders him merely indirect victim. Yes. Okay. I'm just trying to understand that. That's all. I'm not passing judgment on it. I'm trying to understand it. Right. May I say a word about the pay-to-play allegations? Well, 30 seconds, maximum. Okay. The pay-to-play allegations suffer from the same lack of approximate causation because they assume debtors would make different decisions. So that's point one. Point two, they were dismissed on Nick Baltimore league rounds, and correctly so. But point three, Rule 9b applies to allegations of fraud. And these allegations were particularly not made with particularity. There is no specific payer or player even identified. Okay. Thank you very much. We'll hear from Mr. O'Shea, who has three minutes and I know is anxious to speak again. Thank you, Your Honor. First of all, I was asked, I believe it was by you, Judge Cabranes, where in my complaint specifically we allege we would have gotten the contracts. Starting at paragraph 383, we went through and plead specifically in Genon, Alpha Natural Resources, Standard Register, NII Holdings, Edison Mission, AMF Bowling, the specific instances of why we had 100% we would have gotten at least one of those. In paragraph 534, again, we go through and plead. And this is in detail. And again, in paragraph 536. So that's the answer to Your Honor's question on that issue. Next, I want to talk about Mr. Englert's discussion of direct victim. He said the bankruptcy court could be a direct victim. He must know, and certainly the cases are clear, that the bankruptcy court suffers no RICO injury, just like the county in Bridge suffers no RICO injury to business or property. That's just the incorrect statement. When Mr. Englert then turns, well, the U.S. trustee is the direct victim. Well, if the U.S. trustee is the direct victim as a regulator, that essentially reads section 1964 out of the statute. There would be no private right of action, cause of action, in bankruptcy if that were the case. Next, he said that these issues are discretionary with the court. We have pled in our complaint at least three instances that there would not be discretion with the court. But then you go to some of the issues here, like outright theft, like undisclosed preference payments not returned. And he thinks and suggests to this court, well, the court might ask for remedial action. Generally speaking, courts don't ask for remedial action when they have fraud presented and outright theft of $6 million presented to them. That's just not realistic. Then he said... Mr. O'Shea, could I invite you to respond to your adversary's point at the very end. When he said that your client is an indirect victim, I understood him, and perhaps I'm wrong, not to mean that the people elsewhere in the chain, bankruptcy, judge, trustee, the four steps he outlined, not that those people have a legal cause of action for money, but simply that those other steps need to be taken in order to get to your client's loss. And the very fact that there are four or at least three steps by decision-makers between their alleged fraud and your recovery, that's what renders you indirect. Not that the bankruptcy judge has suffered a financial loss. I didn't understand him even claiming that. But just that the existence of three steps between the fraud and your client renders you indirect for purposes of RICO jurisprudence. Could you reply to that argument? That's not correct, your honor. And Empire, the last time this circuit has spoken on RICO directness, really gives you the answer. And the reason why the plaintiff in Empire did not prove direct injury is his injury derived from an upstream taxing authority that had a damage, in other words, there was excise tax fraud, smuggling. So the first, the state taxing authority was damaged. And the only way the plaintiff could prove damage is the deriving his injury from that upstream taxing authority. And I think your honor was the one who actually challenged my adversary on this is, look, we lost the contract. Our injury doesn't derive from anyone upstream. It is direct. We lost the contract. So that's the answer to the question, I believe, your honor. I hope I answered your question. All right, you've exhausted the rebuttal time, but take 30 seconds to say whatever else comes to mind. Yes, thank you, your honor. Well, two other things that my adversary said. One, he said that on a motion to dismiss, the tie goes to the defendant. That's a standard that is nonexistent. Then he said strong probability is not enough. I think, Judge Newman, you are correct when you said it's more likely than not. And I think you challenged me on that. And we acknowledge that the standard is more likely than not that we would have gotten one of these contracts. With that, I will stop talking, your honor. Well, thank you both. Excellent. Thank you both. Well done on both sides. Yes, much appreciated. Thank you, your honor. Thank you. We'll reserve the decision.